ROLLINS HUDIG HALL OF
RHODE ISLAND, INC.

v.

R. Gary CLARK, Tax Administrator.

Frank B. Hall of Rhode Island, Inc.

v.

R. Gary Clark, Tax Administrator.

No. 99–383–M.P.

Supreme Court of Rhode Island.

Nov. 27, 2001.

Marcia McGair Ippolito, Providence, for Plaintiff.

Howard E. Walker, Providence, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

R. Gary Clark, the State of Rhode Island tax administrator, sought review of the District Court's decision on two consolidated tax appeals.[1]  At issue was whether Rollins Hudig Hall of Rhode Island, Inc. and Frank B. Hall of Rhode Island, Inc., must pay taxes on premiums paid to them for insurance that they allegedly procured for Textron, Inc., a corporation headquartered in Rhode Island.  For the reasons set forth herein, the petition for certiorari is granted in part and denied in part.

### Facts and Legal Issues under Review

Rollins Hudig Hall of Rhode Island, Inc., with its predecessor-in-interest, Frank B. Hall of Rhode Island, Inc. (collectively, respondent or Hall–RI), was at all relevant times a surplus lines insurance broker, licensed under G.L.1956 § 27–3–38(a), which reads in part,[2]

> "The insurance commissioner may issue a surplus line broker's license to any person, firm, or corporation who or which is licensed as an insurance agent in this state, authorizing the licensee to procure, subject to the restrictions herein provided, policies of insurance, except life and health and accident, from insurers which are not authorized to transact business in this state."

On December 20, 1991, after a field audit, the tax division issued three notices of deficiency to respondent, Hall–RI, as a consequence of the provisions of subsection (d) of the surplus lines insurance statute:

> "Every person, firm, or corporation licensed pursuant to the provisions of this section shall file with the insurance commissioner, not later than April 1 of each year, a certificate of the tax administrator, on a blank furnished by the insurance commissioner, certifying that the licensee has paid to the tax administrator, for all policies procured by the licensee pursuant to the license, during the next preceding calendar year, a tax, computed at the rate of three percent (3%) on the gross premiums charged the insured by the insurers, less the amount

1.  The appeals were filed by Frank B. Hall of Rhode Island, Inc. (A.A.94–233), and by its successor-in-interest, Rollins Hudig Hall of Rhode Island, Inc. (A.A.94–230).  They were consolidated in the District Court by agreement of the parties.

2.  General Laws 1956 § 27–3–38 has undergone several amendments and reenactments since this dispute began.  Unless otherwise noted, we rely on the 1989 reenactment that added only minor stylistic changes to the 1987 version, which was not amended again until 1996.

of premiums returned to the insureds." Section 27–3–38(d).

Specifically, Hall–RI was assessed a $3,058,340 tax deficiency on premiums for aircraft products liability insurance issued in 1988, 1989, and 1990 to respondent's client, Textron, Inc. (Textron). Although Hall–RI contended that its Massachusetts affiliate, Frank B. Hall of Massachusetts, Inc. (Hall–Mass), solicited, assembled, and placed the coverage at issue, Hall–RI filed tax returns for a portion of the premiums, pursuant to § 27–3–38(d), and filed affidavits, pursuant to § 27–3–38(b),

> "setting forth facts showing that the insured and the licensee were unable, after diligent effort, to procure from any authorized insurer or insurers the full amount of insurance required to protect the property owned or controlled by the insured or the risks insured, and further showing that the amount of insurance procured from an unauthorized insurer or insurers is only the excess over the amount, if any, so procurable from authorized insurers and that the purpose of obtaining that insurance from unauthorized insurers is not to procure insurance on forms different from those which would be used by authorized insurers writing insurance against the same risks or hazards." Section 27–3–38(b).

At issue here was whether Hall–RI "procured" an unreported portion of Textron's coverage from unauthorized/unapproved carriers "pursuant to" its Rhode Island surplus lines insurance broker's license, such that respondent is subject to the 3 percent tax under § 27–3–38(d) on the premiums Textron paid.[3]

The respondent contended that, in general, there are three sources from which an insured can obtain coverage for excessive risks, the premiums for only two of which are taxable in Rhode Island. The first source by which an insured can obtain insurance is through ordinary commercial channels from insurers authorized to provide such coverage. In such cases, an authorized carrier must pay an insurance tax in the amount of 2 percent of the gross premiums on all coverage of Rhode Island risk, pursuant to G.L.1956 § 44–17–1, and, in addition, must contribute to the Rhode Island insurers' insolvency fund, in accordance with G.L.1956 § 27–34–6. Textron sought insurance for approximately $500,000,000 of risk during each of the policy periods at issue. Approximately 45 percent of this risk was insured through authorized insurers, who presumably paid the proper taxes. Such coverage is not at issue here.

Because authorized insurers did not cover the total risk, Textron sought alternative sources to insure the remaining 55 percent of the $500,000,000 risk. An insured such as Textron may use a second source to obtain coverage for its remaining risk by purchasing "surplus lines" insurance through a licensed surplus lines broker who may procure additional insurance from unauthorized/approved insurers, named in a list published by the Department of Business Regulation. Section 27–3–40. These unauthorized insurers are not subject to the same regulations that apply to authorized insurers, and they are not directly taxed on the premiums they receive for surplus lines coverage. Instead, the broker obtaining such coverage for a client must pay the 3 percent surplus lines premium tax "for all policies *procured* by

---

**3.** Under § 27–3–38(d), the "licensee" (the broker, Hall–RI) is subject to the tax, not the insured (Textron).

the licensee *pursuant to* the license," in accordance with § 27–3–38(d). (Emphases added.) A portion of Textron's remaining 55 percent risk was procured through such unauthorized/approved carriers, and Hall–RI reported and paid the 3 percent tax on the insurance acquired from those carriers.

Yet, several of the insurers that provided the remaining coverage were not on the insurance commissioner's list of unauthorized but approved insurers, and Hall–RI did not report and pay tax on the premiums paid to such unauthorized/*un* approved carriers. The tax administrator (petitioner here) contended that Hall–RI procured coverage on Textron's behalf from these unauthorized/unapproved carriers contrary to the licensing provisions of § 27–3–38(a) and has attempted to avoid paying the surplus lines tax by circumventing statutory requirements.

Hall–RI argued that because *it* did not procure the insurance from the unauthorized/*un* approved carriers, Hall–RI owed no tax on the premiums that Textron paid to these unauthorized insurers. Rather, Hall–RI maintained that Hall–Mass either procured the coverage from unauthorized insurers or helped Textron acquire the coverage by a third method, namely, direct placement by Textron. In this method, an insured obtains its coverage from insurers without the aid of a broker. Hall–RI contended that a gap in Rhode Island's tax laws effectively excludes from taxation the premiums paid for unauthorized coverage obtained directly by an insured. According to Hall–RI, the insurance premiums in question fell within this gap and therefore were not taxable. The tax administrator, on the other hand, argued that, in accordance with the affidavits and tax returns filed by Hall–RI, the insurance at issue, in fact, was surplus lines coverage—the second type described—procured by respondent pursuant to its license. Consequent-

ly, he argued that the premiums for that coverage *were* subject to the 3 percent tax.

## Procedural History

On January 3, 1992, after the tax administrator issued notices of deficiency, respondent requested an administrative review, pursuant to G.L.1956 § 42–35–9 of the administrative procedures act. On review, the hearing officer found that Hall–Mass, not Hall–RI, had procured Textron's insurance. In interpreting § 27–3–38, the hearing officer ruled that it was legally impossible for Hall–RI to have procured unauthorized/*un* approved coverage "pursuant to its license," because § 27–3–38(a) licenses brokers to procure insurance only from *approved* insurers. She therefore concluded that the coverage that Textron obtained from unauthorized/*un* approved insurers is not taxable under § 27–3–38(d). The hearing officer also concluded that Textron was required to use a Rhode Island surplus lines broker to place coverage with unauthorized/approved insurers. Accordingly, she did not rebate the interest that Hall–RI paid on its late payment on the taxes for that coverage.

The final decision and order of the tax administrator, however, modified the hearing officer's recommendation, reaffirmed the original deficiency determination in full, and found that Hall–RI owed tax on the premiums paid for the unauthorized insurance that Textron obtained from *un* approved sources. In particular, the tax administrator found that the affidavits filed by respondent—which state that Hall–RI "was engaged by the insured named herein [i.e., Textron], either directly or by a licensed Rhode Island agent or broker to obtain insurance against certain risks" and that the insured "directed" Hall–RI to obtain such insurance—constituted, "in effect, a contractual agreement between the taxpayer and Textron to obtain surplus lines coverage on Textron's

behalf." The tax administrator emphasized that because respondent named itself the broker in these affidavits, all of Textron's unauthorized insurance, including the coverage obtained from *un* approved sources for which respondent did not file a tax return, was procured pursuant to respondent's license, either by respondent or by others acting on respondent's behalf.

On August 30, 1994, Hall–RI appealed the tax administrator's decision to the Sixth Division of the District Court, which reviewed the case *de novo*, pursuant to G.L.1956 § 8–8–24. The parties submitted a "Stipulation of Facts Consisting of Complete Administrative Record in Lieu of Oral Testimony and Exhibits in De Novo Tax Appeal." Based on the stipulated record, the District Court set aside the tax administrator's final decision and agreed with the hearing officer that Hall–Mass, rather than Hall–RI, had "procured" the insurance at issue. The District Court found that the affidavits, "though damning are not dispositive." The court adopted the hearing officer's interpretation of the statute, finding that coverage from unauthorized/*un* approved insurers, by definition, cannot be procured "pursuant to" a surplus lines license. The District Court further found that because Hall–RI did not actually place any of Textron's unauthorized coverage, Hall–RI was not liable for interest on late payments on taxes Hall–RI voluntarily paid on premiums to unauthorized/approved insurers. The court then ordered a refund of the entire amount of the original deficiency assessed by the tax division, plus interest. The tax administrator (petitioner) filed a petition for certiorari, and this Court issued the writ.

### Standard of Review

It is well settled that on a petition for certiorari, this Court examines the record "to determine if an error of law has been committed," *City of Providence v. S & J 351, Inc.*, 693 A.2d 665, 667 (R.I.1997) (per curiam) (quoting *Matter of Falstaff Brewing Corp. Re: Narragansett Brewery Fire*, 637 A.2d 1047, 1049 (R.I.1994)), and "to determine if any legally competent evidence exists therein to support the findings made by the trial justice." *Id.* In reviewing a District Court's decision on a tax matter, brought before us under § 8–8–32, we do not weigh the evidence in the record to resolve disputes of fact. *Dart Industries, Inc. v. Clark*, 696 A.2d 306, 309 (R.I.1997). Rather, we address " 'questions of law involving the applicability of a statute to undisputed facts.' " *Id.* Here, the District Court did not hear oral testimony but relied only on the materials in the record to which the parties stipulated. Critical to our analysis is our determination of the applicable law in relation to the facts.

### Applicability of G.L.1956 § 27–3–38

As a preliminary matter, we note that the District Court relied on § 27–3–38, as amended by P.L.1996, ch. 188, § 3. The public law enacting that amendment clearly states, "This act shall take effect upon passage," an event that occurred on August 5, 1996. P.L.1996, ch. 188, § 24. The taxes assessed in the case before us, however, were incurred during the 1988, 1989, and 1990 tax years, and Hall–RI's complaint was filed in the District Court in 1994. Given that the previous amendment to § 27–3–38 occurred in 1987, effective on June 25, 1987, P.L.1987, ch. 166, §§ 11, 16, it is clear that the statute's *1987 version* is applicable to this case, not the 1996 version.[4]

---

4. As previously stated, all quotations in this opinion, unless otherwise noted, are from the 1989 reenactment of § 27–3–38. This reenactment did not substantively modify the 1987

This error, however, does not affect our conclusion that Hall–RI's actions in this case did not invoke the taxing provisions of § 27–3–38(d) with respect to placements with unauthorized/unapproved carriers because neither the 1987 nor the 1996 version of the statute required Textron to obtain its coverage through a Rhode Island surplus lines broker, and neither version imposed the tax unless a Rhode Island surplus lines broker actually "procured" the coverage. Section 27–3–38 contained no language imposing an obligation upon insureds to obtain their unauthorized insurance through a Rhode Island surplus lines broker, nor did the statute impose a tax upon insurance obtained directly by an insured or by an out-of-state broker. Rather, the statute imposed a tax "for all policies procured by the licensee pursuant to the license." The tax in question was a procurement tax upon licensed surplus lines brokers, and no tax was due unless and until a broker licensed in Rhode Island procured the insurance.

In this case, it is our conclusion that in 1988, 1989, and 1990, Hall–RI did not procure the coverage at issue "pursuant to" *its* surplus lines broker's license. Consequently, Hall–RI was not subject to the taxing provisions in § 27–3–38(d) during those years.

### Affidavits Filed by Hall–RI

Section 27–3–38(b) requires Rhode Island surplus lines brokers to execute affidavits "[w]hen any policy of insurance is procured under the authority of [the affiant's Rhode Island surplus lines broker's] license." In the affidavits it filed with the insurance commissioner for the 1988, 1989, and 1990 tax years, Hall–RI stated that it "was engaged by" Textron

"either directly or by a licensed Rhode Island agent or broker" to obtain insurance for the property described. The affidavits went on to state that diligent effort was made to procure "$500,000,000 Comprehensive Aviation Liability" from authorized companies and that Hall–RI had "effected the insurance shown on the reverse side" of the affidavits. On the reverse side, Hall–RI listed Textron's unauthorized/approved insurers, but did not list any of the unauthorized/*un* approved carriers that contributed to the $500,000,000 coverage. In addition to Hall–RI's statements, Textron stated that it "directed [its] insurance agent or broker to obtain insurance against certain risks covering property as described on the reverse side" and that it "directed [Hall–Mass], a licensed Rhode Island agent (broker) to obtain said insurance from such [unauthorized] companies through the office of [Hall–RI], a licensed Surplus Line Broker."

Notwithstanding our disagreement with the tax administrator's ultimate contention that Hall–RI was liable for the taxes on all of Textron's coverage, including the unauthorized/unapproved coverage not listed on the affidavits, we do agree that the filing of the affidavits under color of a Rhode Island surplus lines broker's license is not severable from "procuring" the coverage, but merely the final stage of the process. A Rhode Island surplus lines broker's license carries with it the imprimatur of state authority. The filing of affidavits is an obligation that runs with the privilege of licensure, and we hold that any broker required, under the terms of its licensure, to attest to the purposes for which it has used its license must be held

---

version of the statute, but refined the section by making minor stylistic changes and adding subsection designations.

to those attestations. Under the power of its taxing authority, the tax administrator is entitled to rely upon the sworn representations of licensed brokers.

With respect to the affidavits in this case, although the listing of "$500,000,000" was interpreted by the tax administrator to imply that Hall–RI procured all of Textron's surplus lines insurance—including the unauthorized/unapproved coverage—the affidavits do not disclose that Hall–RI procured coverage for Textron from any source other than those listed on the chart appended to the reverse side of the affidavits. Thus, although we agree that affiants should be held to their attestations as a matter of law, these affidavits do not state that Hall–RI procured the unauthorized/*un*approved portion of Textron's coverage.

Both the hearing officer and the District Court examined the underlying facts and determined that Hall–RI, in fact, did not procure Textron's unauthorized/unapproved coverage. Legally competent evidence in the record indicated that Hall–RI did not actively participate in negotiating Textron's coverage with the unauthorized/unapproved insurers. For example, respondents' witnesses testified at the hearing that Hall–Mass was solely responsible for placing Textron's unauthorized coverage. In addition, Robert Godin, the senior revenue agent who conducted the audit of Hall–RI, testified—and the tax administrator concurred at oral argument—that the records disclosing the unauthorized/unapproved coverage on which the tax division relied in preparing its notices of deficiency were obtained from Hall–Mass's office in Massachusetts. Because all information regarding the procurement of Textron's unauthorized/unapproved coverage came from the records of Hall–Mass, the District Court's finding that Hall–RI was not directly involved in

placing the coverage contained in those records was correct. Moreover, we discern no authority under which the Rhode Island tax division may assess a tax on the out-of-state placements. Therefore, for purposes of imposing the taxing provisions authorized in § 27–3–38(d), we hold that the District Court did not err in finding that Hall–RI did not procure the unauthorized/unapproved coverage that was not listed on the affidavits. Because Hall–RI did not itself participate in placing that coverage, and consequently did not identify it on the affidavits listing the insurance it procured, and because the Rhode Island tax auditor was able to identify the unauthorized/unapproved coverage only by traveling to Massachusetts to examine the records of Hall–Mass, we conclude that the premiums for the unauthorized/unapproved coverage were not taxable in Rhode Island.

■ On the other hand, given that the tax administrator is entitled to rely upon the sworn statements in the affidavits, we conclude that Hall–RI is liable for the taxes it has voluntarily paid for placements with unauthorized/approved surplus insurers and consequently for the interest it was assessed and it paid because of the late payment of those taxes. Accordingly, we reverse that portion of the District Court's decision stating that "taxpayer [Hall–RI] is not subject to interest payments" on late taxes paid as a result of placements with unauthorized/approved surplus brokers. Therefore, Hall–RI is liable for the interest on the late-paid surplus taxes.

### Conclusion

In summary, the judgment of the District Court is reversed to the extent that it relieved Hall–RI from paying interest on late payments of the taxes on placements with the unauthorized/approved surplus in-

surers and affirmed to the extent that it relieved Hall–RI from paying taxes on the placements with unauthorized/unapproved surplus insurers. Accordingly, the petition for certiorari is granted in part and denied in part, and the judgment is quashed in part and affirmed in part. We remand the papers of the case to the District Court with our opinion endorsed thereon.

FLANDERS, Justice, concurring.

Although I join the Court's opinion, I write separately to amplify the reasons why I believe we should affirm the District Court's judgment in all respects, except for its treatment of the prejudgment-interest issue. In my opinion, the tax administrator lacked the authority and the requisite factual basis to tax \$3,281,487.54[5] to the respondent, insurance-broker Rollins Hudig Hall of Rhode Island, Inc. (Hall–RI), for allegedly procuring certain surplus-line insurance covering the aviation-liability risks of its client, Textron, Inc. (Textron), a Rhode Island insured. This tax represented 3 percent of the insurance premiums paid by Textron for a portion of the \$500 million in surplus-line aviation-liability insurance that Textron obtained from certain out-of-state insurers during the tax years 1988 through 1990. These insurers did not appear on a list maintained by the insurance commissioner for so-called acceptable, or approved, surplus-line insurers.

In assessing this tax against Hall–RI, the tax administrator relied upon affidavits submitted by Hall–RI that purportedly confirmed its procurement of the insurance in question. In my judgment, that reliance was misplaced. The affidavits do not admit procurement of the policies at issue here. Rather, they admit only to Hall–RI's procurement of surplus-line insurance from certain unauthorized but "approved" carriers; that is, from certain companies that appeared on the insurance commissioner's list of approved insurers that were not authorized to do business in Rhode Island. Hall–RI has paid whatever taxes were due on this insurance. Moreover, the tax administrator misconstrued G.L. 1956 § 27–3–38 when he concluded that Hall–RI in fact owed taxes on the surplus-line insurance that its sister corporation, Frank B. Hall of Massachusetts, Inc. (Hall–Mass), procured for Textron from certain unauthorized and *un* approved carriers. The tax in question was a procurement tax on premiums payable on insurance procured from insurers that were not authorized to do business in Rhode Island. Thus, no tax was due unless and until a licensed broker procured the insurance. Here, Hall–RI did not procure the insurance in question; hence, no tax was due thereon. For these reasons, I agree that the judgment of the District Court should be affirmed in this respect.

I look first to the affidavits submitted by Hall–RI for the years in question. In his brief and at oral argument, the tax administrator argued that the affidavits submitted by Hall–RI and Textron for the years 1988–1990 demonstrated that Hall–RI had procured \$500 million of surplus-line aviation insurance for its insured customer, Textron. The language in the affidavits, however, did not go this far. The affidavits stated, in relevant part, that Hall–RI "was *engaged* by the insured [Textron] * * * to obtain insurance against certain risks * * *" (emphasis added), that its insured client, Textron had "directed" it to do so, and that the "licensed Surplus Line Broker has effected the insurance shown on the reverse side * * *." On the reverse side, however, the affidavits listed *only* the insurance that was actually procured from unauthorized but approved insurers—insurance for which Hall–RI has paid whatever taxes were assessed thereon. None of this insurance, however, is at

---

**5.** The administrator's tax assessment against Hall-RI was \$3,058,340.00, but Hall-RI actually remitted \$3,281,487.54 to the tax administrator, which included the tax assessment, late fees, and interest. The Superior Court ordered the tax administrator to refund to Hall-RI the total amount it had paid: \$3,281,487.54.

issue in this case. Rather, the tax administrator is contending that additional insurance obtained for Textron from various "unapproved" insurers—that is, from unauthorized insurers who were not listed on the insurance commissioner's list of "approved" insurers and who were not listed in the affidavits—also was subject to the procurement tax. The sole basis for this claim is that the affidavits admit that Hall–RI was engaged and directed to procure this insurance. But merely being engaged and directed to procure insurance is not the same thing as actually doing so. The tax in question falls only on licensed Rhode Island brokers who have procured surplus-line insurance, but not on those who merely were directed or engaged to do so, but never actually did the deed.

Based upon the stipulation of facts submitted to the District Court, it is undisputable that Hall–RI did not procure the insurance that the tax administrator sought to tax. Indeed, the trial justice found Hall–RI's affidavits "essentially false" because, during the tax period in question, Hall–RI never procured *any* surplus-line insurance for Textron from any insurers, whether they were approved or not. Moreover, it was never engaged or directed to do so. But merely by misrepresenting—against its financial interests and under the mistaken impression that it was required by law to do so—that it had

procured surplus-line insurance from certain listed insurers, Hall–RI did not thereby admit to procuring any additional insurance from the unlisted, unauthorized, and unapproved insurers who actually issued the insurance in question to Textron. Thus, the false representations in the affidavits do not add to or change the limited nature of the admissions contained therein.[6] Although the affidavits falsely aver that Hall–RI was "*engaged*" and "*directed*" to procure $500 million in surplus-line insurance for Textron (in fact, it was not so "engaged" or "directed"), nowhere in the affidavits does Hall–RI admit or aver that it actually procured the insurance at issue (namely, surplus-line insurance from unauthorized and unapproved insurers). Therefore, Hall–RI cannot and should not be held responsible for paying a procurement tax based upon affidavits that do not contain any admission that Hall–RI procured the insurance that the tax administrator claimed was taxable.[7]

Furthermore, § 27–3–38(d), the statute that the tax administrator invoked to hold Hall–RI responsible for taxes attributable to the surplus-line insurance procured by Hall–Mass did not apply to insurance that Hall–RI did not procure. Section 27–3–38, which was in effect during the 1988 to 1990 audit period, was amended in 1996. But the key statutory language was unchanged by the 1996 amendments, providing that

6. The stipulated facts demonstrated that Hall–Mass procured Textron's surplus-line insurance and that Hall–RI never in fact procured any surplus-line insurance for Textron. Nevertheless, believing that it was required by law to pay taxes on any surplus-line insurance obtained from unauthorized but approved insurers for a risk located in Rhode Island, Hall–RI submitted affidavits indicating that it had procured surplus-line insurance from the approved insurers listed in its affidavits when in fact it had not done so. And it also paid whatever taxes were due thereon, even though it never actually procured this insur-

ance. The tax administrator seized upon this admission and attempted to bootstrap the affidavits into an additional tax liability for insurance not covered by the affidavits.

7. Because Hall–RI has paid all taxes due for the policies listed on the affidavits as having been procured by Hall–RI, those taxes are not at issue in this case. Moreover, to the extent the tax administrator's assessment includes late fees for those taxes, I agree that Hall–RI is bound by their affidavits, and that it must pay the late fees, even though it now attempts to controvert what it swore was true.

the tax was due "for all policies procured by the licensee pursuant to the [surplus-line broker's] license." *Compare* § 27–3–38(d) (as amended by P.L.1996, ch. 188, § 3) *with* § 27–3–38(d) (1989 Reenactment). Although it was unfortunate that the trial justice, in rejecting the tax administrator's position, used language in his opinion from the 1996 amendment to the statute when the earlier version was applicable, the 1996 amendment did not affect, and indeed could not have affected, the result in this case because Hall–RI did not procure the insurance that the tax administrator sought to tax. Moreover, both versions of the statute contained the procurement requirement.

In addition, under § 27–3–38 as it existed for the years in question (1988–1990), it is clear that Hall–RI could not legally have procured the insurance in question under the authority of its license. This Court has recognized the appropriateness of judicially noticing interpretive regulations issued by the Department of Business Regulation (DBR). *See Sparling v. Bizier,* 778 A.2d 808, 810 (R.I.2001); *see also Trotta v. Pono,* 116 R.I. 702, 709, 360 A.2d 552, 556 (1976). During the years 1988 through 1990, Regulation XI of the Department of Business Regulation, Insurance Division, entitled "Surplus Line Brokers: General Rules; Affidavits, Records And Tax," provided in subsection (b) of the General Rules section, that a licensed surplus-line broker such as Hall–RI "shall not place risks or effect insurance in unauthorized or non-admitted companies that are not on the Insurance Commissioner's list of acceptable Surplus Line insurers." Thus, Hall–RI was barred by this regulation from procuring the insurance in question because all the companies who issued the insurance at issue were "unapproved;" that is, they were not on the insurance commissioner's list of acceptable surplus-line insurers. As a result, Textron was barred

by applicable Rhode Island law from obtaining this insurance through a licensed surplus-line insurance broker such as Hall–RI. On the other hand, contrary to the tax administrator's position, no law prevented Textron from obtaining this insurance directly or through an out-of-state broker such as Hall–Mass. Sections 27–3–38 and 27–3–40 were not directed to insureds such as Textron or to out-of-state brokers such as Hall–Mass, but only to "any person, firm, or corporation who or which is licensed as an insurance agent in this state." Section 27–3–38(a).

Other states, however, have enacted definitive statutory provisions addressing this situation, provisions that Rhode Island lacks. For example, the State of Connecticut has provided that "[e]very insured who in this state *procures or causes to be procured * * ** [surplus lines insurance] other than insurance procured through a surplus lines broker * * * " is subject to a tax. Conn. Gen.Stat. Ann. § 38a–277(a) (West 2001). (Emphasis added.) This language indicates that the only way for insureds in Connecticut to procure surplus-line insurance is to use a licensed surplus-line broker located in that state, or subject themselves to the tax for a direct purchase of the insurance. Rhode Island's surplus-line insurance statute, however, contains no such language because it is directed solely to in-state insurance brokers such as Hall–RI, and not to insureds such as Textron or to out-of-state brokers such as Hall–Mass. Thus, applicable Rhode Island law did not prevent an out-of-state broker such as Hall–Mass or a Rhode Island insured such as Textron from procuring the insurance in question without incurring the tax liability. Such insurance is not subject to the procurement tax because it was not obtained by Hall–RI or by any other licensed Rhode Island broker. Indeed, as previously noted, an applicable DBR regulation

actually prevented Hall–RI, as a licensed Rhode Island broker, from procuring such insurance from the unapproved carriers that issued the insurance in question.

The trial justice found "that the testimony, not the affidavits, presents the true picture of what happened here." In essence, the trial justice determined that Hall–RI had nothing to do with procuring the insurance policies at issue in this case. The trial justice (and the hearing officer before him) both determined as a matter of fact that Hall–Mass had procured the insurance at issue. This Court has held that "[i]f, on review, the record indicates that competent evidence supports the trial justice's findings, we *shall not* substitute our view of the evidence for his even though a contrary conclusion could have been reached." *Tim Hennigan Co. v. Anthony A. Nunes, Inc.*, 437 A.2d 1355, 1357 (R.I.1981) (citing *Tefft v. Tefft*, 105 R.I. 496, 253 A.2d 601 (1969)). (Emphasis added.) Here, *no* competent evidence, including the affidavits, supports the contrary conclusion. Therefore, this Court is bound to accept the trial justice's findings regarding who actually procured this insurance, especially when the affidavits in question, however false they may be on other matters, do not admit to procurement of the insurance at issue.

### Conclusion

Because the insurance in question was not "procured" by Hall–RI (whether pursuant to its license or otherwise), no tax is or was ever due on the premiums paid with respect to that insurance.[8] Although the affidavits that Hall–RI submitted ac-

knowledge procuring other surplus-line insurance, Hall–RI has *paid* whatever taxes were due on those policies, does not now seek to recoup those payments, and must pay whatever late fees were owing on those taxes. Given the clear statutory language and DBR regulations in this area, Hall–RI should not be held responsible for any tax on the surplus-line insurance policies that either Textron or Hall–Mass procured from so-called "unapproved" insurers. Hall–RI, as the trial justice concluded, had nothing to do with procuring this insurance, and therefore it should not be held responsible for the disputed taxes. Thus, I concur in the Court's decision to affirm in part the judgment of the District Court and hold that Hall–RI is not liable for the taxes in question, except for the late fees assessed on the taxes paid for the insurance covered by the affidavits. With respect to that insurance, however, I agree that Textron and Hall–RI should be held to the admissions in the affidavits and that the tax administrator properly required Hall–RI to pay late fees on the taxes that were due thereon.

---

8. Indeed, under G.L.1956 (1989 Reenactment) § 27–3–40, "No person, licensed to act as a surplus line broker in the state, shall place any insurance with unauthorized insurer unless that insurer * * * " has met certain financial and other legal requirements. Thus, Hall–RI legally could not have placed the insurance at issue because the insurers in question never met those requirements. In short, it was legally *impossible* for Hall–RI to procure surplus-line insurance from unapproved carriers *pursuant* to its state-issued license as a surplus-line insurance broker. The law forbade it from doing so.